1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11

DELPHINE SCOTT JACKSON,

**Case No. 1:14-cv-01573-EPG**

12

Plaintiff,

13

v.

**ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT**

14

CAROLYN W. COLVIN, Acting Commissioner of Social Security

15

Defendant.

16

17

18

### I.    INTRODUCTION

19

Plaintiff Delphine Scott Jackson ("Plaintiff") seeks judicial review of a final decision by

20

the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application

for supplemental security income ("SSI") benefits pursuant to Title XVI of the Social Security

21

Act. The matter is currently before the Court on the parties' briefs, which were submitted without

22

oral argument to the Honorable Erica P. Grosjean, United States Magistrate Judge.[1]

23

### II.    BACKGROUND AND PRIOR PROCEEDINGS[2]

24

Plaintiff was 55 years old at the time of her hearing before the Social Security

25

Administration.  AR 32.  She has completed a GED.  AR 33.  Plaintiff most recently worked in

26

27

28

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (ECF Nos. 7, 9.)
[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

customer service in 2011 and volunteered for the American Legion in June 2012.[3]  AR 34, 36. Plaintiff lives with her adult son and has an adult daughter who lives nearby.  AR 38, 39.

Plaintiff's alleged physical conditions are:  shin spurs, bilateral knee injuries, tail bone injuries, hearing loss, bilateral foot condition, bilateral hip condition, headaches, tinnitus, diabetes, high blood pressure, cataracts, and glaucoma.  AR 208.  She also alleges severe depression.  AR 208.  On April 24, 2012, Plaintiff filed an application for SSI under Title XVI, alleging a disability beginning on September 1, 2011.  AR 61, 186-195.  This application was denied initially on November 9, 2012 and on reconsideration on May 31, 2013.  AR 108-112, 118-122.  Plaintiff filed a request for a hearing on July 3, 2013.  AR 127-129.  The hearing was then conducted before Administrative Law Judge John Cusker (the "ALJ") on April 11, 2014. AR 29.  On June 18, 2014, the ALJ issued an unfavorable decision determining that Plaintiff was not disabled.  AR 10-24.  Plaintiff filed an appeal of this decision with the Appeals Council.  The Appeals Council denied her appeal, rendering the ALJ's order the final decision of the Commissioner.  AR 1-4.

Plaintiff now challenges that decision, arguing that:  (1) The ALJ erroneously rejected opinions by treating physicians finding that Plaintiff was disabled; (2) the ALJ incorrectly rejected Plaintiff's testimony; (3) the ALJ incorrectly rejected the third party statement of Amanda Jackson, Plaintiff's daughter; and, (4) the ALJ failed to consider the effects of Plaintiff's impairments, both in deciding the Plaintiff's residual functional capacity and in posing hypotheticals to the vocational expert.

Defendant contests Plaintiff's assessment, pointing out that:  (1) The treating physician "opinions" to which Plaintiff refers to did not discuss Plaintiff's functional limitations, so there was little for the ALJ to "reject"; (2) Plaintiff's testimony was inconsistent with the medical record; (3) third party Amanda Jackson's statements were rife with inconsistencies; and (4) the ALJ made distinct and thorough findings concerning each of Plaintiff's alleged impairments and reached a residual functional capacity determination that was consistent with the medical record.

---

[3] Plaintiff testified that she last volunteered for the American Legion in June 2012, but her medical records indicate that she was doing so as late as October 2012.  AR 1144.

## III.   THE DISABILITY DETERMINATION PROCESS

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. § 416.920(a)(4).  The ALJ must consider objective medical evidence and opinion testimony.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically-determinable "severe" impairments,[4] (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work,[5] and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the regional and national level.  20 C.F.R. §§ 416.920(a)-(f).

Using the Social Security Administration's five-step sequential evaluation process, the

---

[4] "Severe" simply means that the impairment significantly limits the claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.920(c).

[5] Residual functional capacity captures what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 416.945.  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n. 2 (9th Cir. 2007).

ALJ determined that Plaintiff did not meet the disability standard.  AR 10-24.  In particular, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 24, 2012, the date specified in her application.  AR 12.  Further, the ALJ identified major depressive disorder; bereavement; history of bilateral hallux valgus (bunions) and hammertoes, status post-surgery; and cataracts, status post-surgery as severe impairments.  AR 12.  Nonetheless, the ALJ determined that the severity of Plaintiff's impairments did not meet or exceed any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 12.

Based on a review of the entire record, the ALJ determined that Plaintiff had the RFC to: "perform medium work as defined in 20 CFR 416.967(c).  That is, she is able to lift and/or carry 50 pounds occasionally and 25 pounds frequently, can stand and/or walk 6 hours in an 8-hour workday and sit without limitation in an 8-hour workday.  She is able to climb and crouch frequently, but has no other postural limitations.  She does not need an assistive device, such as a cane, to ambulate.  She can perform simple repetitive tasks."  AR 14.  Plaintiff was unable to perform her past relevant work.  AR 22.  However, the ALJ determined that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including bagger, package sealer, and checker.  AR 23.

## IV.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether: (1) it is supported by substantial evidence; and (2) it applies the correct legal standards. *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

"Substantial evidence means more than a scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  It is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Id.*  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Id.*

///

///

## V.   DISCUSSION

### A.  The Relevant Medical Evidence

Plaintiff argues that the ALJ improperly considered the medical evidence, as well as the statements of Plaintiff and Amanda Jackson, and thus erroneously determined that Plaintiff was not disabled.  Specifically at issue is the ALJ's consideration of:  (1) the opinion of Plaintiff's treating clinicians at the VA; (2) Plaintiff's testimony to the ALJ; and (3) the third party statement of Amanda Jackson.  The following review of the medical record is limited to the records relevant to these issues and the time period in question.

#### i.   Treatment at the VA Medical Center

Plaintiff saw a succession of physicians, nurses, and social workers at the VA Medical Center over the course of several years.  In January 2012, Plaintiff was referred for mental health care treatment by her primary care physician.  AR 509.  Plaintiff reported that she had "been severely depressed ever since her common-law husband of 20+ years died . . . in September 2011."  AR 509.  Plaintiff reported symptoms of depression.  AR 509.  Vesna Gvozdenovic, a registered nurse, administered a mental status examination and found that Plaintiff had a normal affect but euthymic mood.  AR 513.  Plaintiff's attention and concentration was satisfactory; she had no trouble completing serial 7's; was fully oriented; her memory was unimpaired; she had intact cognition; she had intact insight and judgment; and good impulse control.  AR 513-514.  Plaintiff stated that her treatment goals were to "find a job, place to stay and start the process of disability."  AR 515.  Neil Smith, D.O., a staff psychiatrist, reported that Plaintiff was homeless and was working with a VA social worker to find housing and benefits.  AR 508.

On April 18, 2012, Plaintiff was seen by Sabeena Acharya, a resident in the mental health unit, and Dr. Smith.  AR 448.  Plaintiff reported that she was "doing well" and "was surprised to be called in so quickly for a follow up."  AR 447.  She had joined a physical therapy class with her daughter and "expressed how she lost her identity while she was taking care of her dying husband."  AR 447.  She was contemplating getting a degree in social work.  AR 447.  She was planning on moving into Section 8 housing and rated her depression a "4-5/10."  AR 447.  A mental status examination showed good mood; good insight and judgment; and appropriate

1    cognition.  AR 447-448.

2          On May 24, 2012, a staff radiologist reviewed an x-ray of Plaintiff's knees and found

3    "tiny osteophytes" in the "medial joint space."  AR 336.  There was, however, "[n]o significant

4    joint space narrowing . . . no fracture or dislocation . . . [and] no joint effusion."  AR 336.  Also

5    on May 24, 2012, Martin Lauber, M.D., completed a "Disability Benefits Questionnaire" in

6    connection with Plaintiff's application for disability benefits with the VA.  AR 409.  He reported

7    Achilles tendinitis in Plaintiff's right leg and pain in the left knee following a "fall while in

8    service."  AR 410.  He also noted that "[o]ver the years she claims mild discomfort to the left

9    knee only."  AR 410.  He indicated that Plaintiff had no "functional loss and/or functional

10   impairment of the knee and lower leg."  AR 414.  Despite the "diagnosis of degenerative arthritis

11   (osteoarthritis) or traumatic arthritis," Dr. Lauber indicated that Plaintiff's condition would have

12   no impact on her "ability to work."  AR 408, 420.

13         On June 6, 2012, Dr. Lauber further summarized his findings based on his examination of

14   Plaintiff and a review of her file.  AR 400.  He indicated that Plaintiff had "Achilles tendinitis at

15   the right leg," which caused "mild discomfort."  AR 400.  Plaintiff's "[p]hysical examination was

16   entirely normal" and "[r]adiographs of both knees revealed minimal bilateral medial compartment

17   degenerative changes and an apparent bipartite patella present."  AR 400.  Dr. Lauber also noted a

18   "mild bilateral hallux valgus," although radiographs indicated "no significant degenerative

19   changes affecting other areas apart from the first metatarsophalangeal joint."  AR 400.

20         On July 3, 2012, Plaintiff was seen by Alvaro Castillo, O.D., a staff optometrist.  AR 375.

21   Plaintiff was diagnosed with cataracts and new glasses were prescribed.  AR 376.  Plaintiff had

22   no diabetic retinopathy and had 20/30 vision after correction.  AR 375.

23         In October 2012, Plaintiff visited Patrick Mullen, D.P.M., for a podiatry consultation.  AR

24   1061.  She complained of bunions and hammertoes, which had not been remedied by wearing

25   wide shoes.  AR 1061.  She sought treatment from Dr. Mullen because she "wants to return to

26   running."  AR 1061.  Dr. Mullen examined her feet and found a "hallux valgus deformity" on

27   each foot.  AR 1062.  Plaintiff decided that she would like to have surgery to remedy her

28   condition.  AR 1062.  Also in October 2012, Plaintiff met with her assigned social worker and

reported that she had obtained new housing, although she was behind in her PG&E payments. AR 1143.  She also expressed that her "depression has somewhat subsided." AR 1143.  She attributed this change to a relationship with a truck driver named Loren.  AR 1143.  She was considering traveling with him in his truck to see the rest of the country and had been volunteering at the American Legion.  AR 1144.

On November 20, 2012, Ben Brownell, D.P.M., performed bunion surgery on Plaintiff. AR 1107.  He reported no issues with the surgery.  AR 1107.  Later that month, Plaintiff met with her social worker and reported that her surgery went well and her remaining pain was "being tolerated well." AR 1104.  Plaintiff skipped a follow up appointment with Dr. Brownell to change the dressing on her foot and the appointment was rescheduled for the next week.  AR 1103.

In January 2013, Plaintiff told her social worker that she was planning on a 3-4 week trip with her boyfriend in February.  AR 1088.  If she decided that she liked driving the truck, she would "join him in driving." AR 1094.  Her social worker reminded her that the Housing Authority would not allow her to leave her apartment for more than 31 days or she would lose the apartment.  AR 1088.  Plaintiff asked her social worker for a ride to the Social Security office the next day to turn in some paperwork.  AR 1087.  When the social worker arrived to pick Plaintiff up, however, Plaintiff told her that "she was not ready and she would go some other time." AR 1087.

In February 2013, Plaintiff reported to Dr. Brownell for a follow up appointment regarding her bunionectomy.  AR 1086.  She told Dr. Brownell that she was "happy with the results" of the surgery.  AR 1086.

In March 2013, Plaintiff was seen by Jessica Beauchene, a psychiatry resident, for depression.  AR 1066.  Plaintiff reported that she was "struggling with [the] question of who am i?, and what now?" AR 1066.  A mental status examination revealed linear, goal-oriented thought processes, a mood that was "sometimes good, sometimes bad," a restricted affect, good insight and judgment, and appropriate cognition.  AR 1066.  Plaintiff's medication dosage was increased and she was referred to therapy.  AR 1067.

In April 2013, Plaintiff was again seen by Dr. Beauchene.  AR 1257.  She complained of little motivation, difficulty concentrating, and no energy.  AR 1257.  The mental status examination showed linear, goal-oriented thought processes, an "awful, depressed" mood, a dysphoric, restricted affect, and good insight and judgment.  AR 1258.  Plaintiff's medication dosage was increased again and she was referred for therapy with Garry Bredefeld, Ph.D.  AR 1258.  Plaintiff failed to show up for her appointment with Dr. Bredefeld, however.[6]  AR 1249.

In July 2013, Plaintiff met with her social worker and reported continuing depression.  AR 1217.  She was prescribed medication, but explained that "she does not want to take the medication unless she is really having difficulty."[7]  AR 1217.  She was planning a 30 day trip to New York and Pennsylvania to see her sisters and was socializing at the American Legion.  AR 1217.  She also asked her social worker to obtain three tickets to a baseball game for her.  AR 1217.

In September 2013, Plaintiff was seen by Dr. Beauchene and reported that she felt restless and was staying busy by cleaning her house.  AR 1358.  She had been prescribed Ambien but was hesitant to use it, so she borrowed from medication that had been prescribed to her daughter when needed.  AR 1358.  She also reported "spending money for no reason, staying up all night, 'like I'm tweaking or on drugs,' and spend[ing] all night cleaning, washing clothes, and wash[ing] the car at 2am."  AR 1358.  A mental status examination showed linear, goal-oriented through processes, an "awful, depressed" mood, a dysphoric, restricted affect, and good insight and judgment.  AR 1359.  Dr. Beauchene planned to start Plaintiff on a trial of Risperdal.  AR 1359.  Later in September, Plaintiff underwent cataract surgery.  AR 1196.

By December 2013, Dr. Brownell reported that Plaintiff was satisfied with the results of her bunionectomy and wanted the same operation performed on her other foot.  AR 1307.  To prepare for her surgery, Plaintiff received a physical examination.  AR 1319.  She complained of hip and knee pain, but the examination showed "[f]ull range of motion in all extremities."  AR

---

[6] It is unclear whether (or how frequently) Plaintiff ever saw Dr. Bredefeld—there are other instances in the record of Plaintiff failing to show up for scheduled appointments or cancelling appointments at the last minute.  AR 1203, 1302 ("This is now the fifth time in 1 ½ years that she has not showed up for a scheduled apt. Additionally, she has only attended one therapy session in that time period, as well"), 1339.
[7] Plaintiff's social worker had previously noted that Plaintiff was not compliant with her medication.  AR 1223.

1   1322, 1323.

2   On February 24, 2014, Plaintiff saw Carly Marshalla, M.D. for a psychiatric checkup.  AR

3   1277.  Plaintiff reported that her depression had been worse during the holidays but was "a little

4   better" now.  AR 1277.  She reported symptoms of anxiety and trouble sleeping.  AR 1277.  A

5   mental status examination showed linear, goal-oriented through processes, an "awful, depressed"

6   mood, a dysphoric, restricted affect, and good insight and judgment.  AR 1278.  Plaintiff told Dr.

7   Marshalla that she was unable to work because of her anxiety "about being in crowds."  AR 1278.

8   Dr. Marshalla noted that Plaintiff was "no longer in therapy with Dr. Bedefeld due to multiple no-

9   shows."  AR 1278.  Dr. Marshalla discontinued the prescription for Risperdal and started Plaintiff

10  on quetiapine.  AR 1278.

11  ### ii.  *Roger Wagner, M.D.*

12  Dr. Wagner conducted a consultative examination of Plaintiff on September 24, 2012.

13  AR 1023.  He reviewed Plaintiff's foot x-rays from February 17, 2012 and knee x-rays from May

14  24, 2012.  AR 1023.  Plaintiff complained to Dr. Wagner of diabetes, cataracts, and knee pain.

15  AR 1023.  Plaintiff had recently received new glasses from the VA for her cataracts.  AR 1023.

16  Dr. Wagner determined that Plaintiff had "minimal degenerative joint disease on the right knee"

17  and "can walk easily a half mile."  AR 1024.  He noted that Plaintiff was able to make food for

18  herself and clean her apartment.  AR 1024.  She performed "activities of daily living without

19  assistance" and "walks a lot to get around" because she did not have a valid driver's license.  AR

20  1024.  Plaintiff had few problems hearing Dr. Wagner, but acknowledged "problems hearing in

21  crowded rooms or with background noise."  AR 1024.  Her corrected vision was 20/50 in her left

22  eye and 20/70 in her right eye.  AR 1025.

23  Dr. Wagner observed that Plaintiff was able to walk at a "normal pace . . . without

24  assistance."  AR 1024.  She was "very, very easily able to bend over at the waist."  AR 1024.  She

25  walked with a normal station and gait and carried a homemade walking stick.  AR 1025.  Plaintiff

26  had mild hip and groin discomfort on her left side more than the right with internal and external

27  rotation of the hip, but no swelling, tenderness, effusions, or ligamentous laxity in the knees.  AR

28  1026.  Plaintiff had a bunion on her left foot and "trace crepitus in the left knee."  AR 1026.  She

had normal strength in her upper and lower extremities.  AR 1026.

Dr. Wagner diagnosed Plaintiff with diabetes, cataracts, and knee pain.  AR 1027.  Based on these diagnoses, he found that Plaintiff could:  Stand and walk for up to six hours; sit without limitation; lift/carry up to 50 pounds occasionally and 25 pounds frequently; climb and crouch no more than frequently; and should "avoid working around excessive noise given the hearing problems."  AR 1027.  The ALJ adopted Dr. Wagner's recommended functional limitations.  AR 21.

### iii.   Steven Swanson, Ph.D.

Dr. Swanson conducted a psychological consultative examination of Plaintiff on October 30, 2012.  AR 1031.  He reviewed notes from the VA dated April 18, 2012 in conjunction with his examination.  AR 1032.  Plaintiff explained that she stopped attending high school after the 11th grade, although she later obtained a GED.  AR 1032.  Plaintiff has smoked cigarettes since she was 13 years old and was once incarcerated in jail.  AR 1032.  She worked as a security guard for many years until her stepbrother became ill with emphysema and she stopped working to care for him.  AR 1032.  Her daily activities include long walks, arts and crafts, and watching television.  AR 1033.  She lived with her adult children:  a son, who was looking for work, and a daughter, who was applying for Social Security benefits.  AR 1033.  Plaintiff stated that she would like to go back to school and work as a social worker.  AR 1033.

Dr. Swanson observed that Plaintiff was oriented to person, time, place, and situation.  AR 1033.  Plaintiff was "cooperative but not particularly engaging or friendly" and had walked to the office unaccompanied.  AR 1033.  Her mood was euthymic and form/content of thought were within normal limits.  AR 1033.  She had adequate abstraction abilities and intact insight and judgment.  AR 1034.  Her intelligence was estimated to be in the low average range.  AR 1034.

Dr. Swanson determined that Plaintiff was:

. . . able to maintain concentration and relate appropriately to others in a job setting.  She would be able to handle funds in her own best interests.  She is expected to understand, carry out, and remember simple instructions.  She is judged able to respond appropriately to usual work situations, such as attendance, safety, and the like.  Changes in routine would not be excessively problematic for her.  There do not appear to be substantial restrictions in daily functioning. Difficulties in maintaining social relationships do not appear to be present.

AR 1035.  The ALJ incorporated Dr. Swanson's opinion into the RFC.  AR 14.

#### iv.  S. Clancey, M.D. and John B. Kurtin, M.D.

Dr. Clancey reviewed Plaintiff's medical records on November 8, 2012.  AR 69.  Based on this review, Dr. Clancey determined that Plaintiff could:  Lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; and frequently stoop.  AR 68.  Dr. Clancey found that Plaintiff had only mild hearing loss at high frequencies and that any hearing loss was "not considered to be a disability for VA purposes."  AR 69.  The ALJ adopted Dr. Clancey's limitations to the extent they agreed with Dr. Wagner's recommendations.  AR 21.

Dr. Kurtin reviewed Plaintiff's medical records on May 24, 2013.  AR 96.  Based on his review of the records, Dr. Kurtin found that Plaintiff could:  Lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; and frequently stoop and crouch.  AR 95.  Dr. Kurtin also found that there was no evidence of significant hearing loss.  AR 96.  The ALJ adopted Dr. Kurtin's limitations to the extent they agree with Dr. Wagner's recommendations.  AR 21.

#### v.  A. Garcia, M.D. and E. Aquino-Caro, M.D.

Dr. Garcia reviewed Plaintiff's medical records on November 7, 2012.  AR 66.  After reviewing Plaintiff's records, Dr. Garcia determined that her psychological impairments were non-severe.  AR 66.  Dr. Aquino-Caro agreed with this assessment after reviewing Plaintiff's medical records on May 22, 2013.  AR 93-94.

### B.  The ALJ Appropriately Considered Plaintiff's Impairments in Crafting an RFC

#### i.  Legal standard

In step two of the five step analysis, the ALJ is required to determine whether a plaintiff has a "severe" medical impairment or combination of impairments.  20 C.F.R. § 416.920(c).  Once those impairments have been ascertained, the ALJ must interpret the functional limitations imposed by the impairments into an RFC assessment.  20 C.F.R. § 416.945; *Palomares v. Astrue*, 887 F.Supp.2d 906, 919 (N.D. Cal. 2012).  The RFC is then used to pose hypothetical questions to a vocational expert to determine whether the Plaintiff can perform work that exists in

significant numbers in the national economy or past relevant work.  *Ghanim v. Colvin*, 763 F.3d 1154, 1166 (9th Cir. 2014).  To be of "evidentiary value," the hypothetical posed to the vocational expert must "contain[ ] all of the limitations that the ALJ found credible and supported by substantial evidence in the record."  *Id.*

A failure to include an impairment in the analysis at step two is only harmful error if the ALJ fails to consider the functional limitations that flow from that impairment at later steps in the sequential evaluation.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("The decision reflects that the ALJ considered any limitations posed by the bursitis at Step 4.  As such, any error that the ALJ made in failing to include the bursitis at Step 2 was harmless").  In creating an RFC, an ALJ need only consider limitations that are supported by objective evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("We will affirm the ALJ's determination of Bayliss's RFC if the ALJ applied the proper legal standard and his decision is supported by substantial evidence. In making his RFC determination, the ALJ took into account those limitations for which there was record support that did not depend on Bayliss's subjective complaints. Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary").

### ii. Analysis

Plaintiff contends that the ALJ erred by neglecting to consider her arthritis, carpal tunnel syndrome, and hearing loss as impairments at step two of his analysis.  (Plaintiff's Opening Brief 11:8-10, ECF No. 15.)  As a consequence of this failure, Plaintiff claims that the ALJ did not adequately account for Plaintiff's limitations in the hypothetical that he posed to the vocational expert.  In particular, Plaintiff alleges that the ALJ failed to account for her "pain, hand weakness and use of a cane for balance and ambulation."  *Id.* at 12:8-9.  The failure to include Plaintiff's arthritis, carpal tunnel syndrome, and hearing loss at step two, Plaintiff thus argues, precludes the ALJ from relying on the testimony of the vocational expert.

Defendant responds that the mere existence of an impairment is not, by itself, disabling. (Defendant's Responsive Brief 17:20-22, ECF No. 19, *citing Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).)  Thus, the mere fact that Plaintiff had arthritis, carpal tunnel syndrome, and

12

1   hearing loss does not necessarily establish the need for functional limitations arising out of those

2   impairments (nor the inclusion of those limitations in a vocational expert hypothetical).

3   Alternatively, Defendant argues that the ALJ correctly evaluated each of the impairments and

4   properly omitted the impairments that did not create functional limitations.

5       Contrary to Plaintiff's claims, the ALJ considered the limitations imposed by each of the

6   specified impairments.  With respect to Plaintiff's carpal tunnel syndrome, for example, the ALJ

7   expressly found that the objective evidence in the record did not support the imposition of

8   functional limitations.  AR 15 ("The claimant's medically determined impairments could not

9   reasonably be expected to cause most of these alleged functional limitations. Notwithstanding her

10  allegation of carpel [sic] tunnel syndrome, objective findings do not support the diagnosis"),

11  *citing* AR 1328.  The ALJ's finding here is supported by substantial objective evidence.  *See, e.g.*,

12  AR 1026 (Plaintiff had 5/5 bilateral grip strength), 1027 (Plaintiff has no manipulative

13  limitations).  Even the portions of the record that Plaintiff cites in support of her argument are

14  based solely on her subjective complaints.  AR 1239 ("Pt reports h/o carpal tunnel syndrome

15  diagnosed several years ago at outside facility").  The ALJ appropriately determined that

16  Plaintiff's alleged carpal tunnel syndrome was not credible or supported by substantial evidence.

17  Thus, there was no error in failing to include any carpal tunnel limitations in the RFC or in the

18  hypothetical posed to the vocational expert.  *Ghanim v. Colvin*, 763 F.3d 1154, 1166 (9th Cir.

19  2014).

20      The ALJ also amply discussed Plaintiff's allegations of arthritis pain.  AR 15 (Plaintiff

21  "alleged arthritis pain in her feet, knees, and hips . . . [o]ther reports indicate allegations by the

22  claimant including a history of fibromyalgia, but medical findings do not support the diagnosis. In

23  fact, physical examinations have been relatively unremarkable, except for findings of hallux

24  valgus and hammertoes") (internal citations omitted), AR 16 ("The claimant alleged that she used

25  a cane, but admitted no doctor prescribed it. She allegedly used it when her arthritis, her knees,

26  and her back gave her problems, i.e., 'almost all the time.' She brought a walking stick (not a

27  cane) to the hearing. Dr. Wagner noted the claimant's walking stick, and opined she did not need

28  it to ambulate") (internal citations omitted).  Substantial objective evidence in the record also

supported the ALJ's treatment of Plaintiff's arthritis allegations.  AR 400 ("Physical examination was entirely normal . . . [r]adiographs of both knees revealed minimal bilateral medial compartment degenerative changes"), 420 ("The Veteran does not have a finding of mild degenerative arthritis"), 865 (Plaintiff reported "ambulatory without difficulty.").  For example, Dr. Wagner did, in fact, find that Plaintiff's walking stick was "[n]ot necessary."  AR 1025.  And, as with carpal tunnel syndrome, the evidence in the record that Plaintiff asserts supports limitations based on her arthritis consists of *subjective* reports about her general pain level, not *objective* evidence of functional limitations.  It was not clear legal error for the ALJ to decide not to include these limitations in the RFC and not to incorporate them into the hypothetical posed to the vocational expert.

Finally, the ALJ considered the limiting effects of Plaintiff's alleged hearing loss both in his decision and in the questions he posed to the vocational expert.  In fact, the ALJ's first mention of Plaintiff's hearing loss includes an acknowledgment that some functional limitations are warranted.  AR 12 (" . . . the claimant's hearing loss is not severe. However, some environmental limitations are warranted, a[s] indicated in Finding No. 3, infra.").  The ALJ also discusses Plaintiff's hearing loss (and the concomitant functional limitation) when discussing the weight of the medical evidence and indicates that "some weight" will be given to Dr. Wagner's recommendation that an environmental limitation be imposed.  AR 21 ("Neither medical consultant assessed any environmental limitations, but Dr. Wagner suggested avoiding excessive noise; I accord his opinion some weight.").  The ALJ later incorporated an environmental limitation into the hypothetical question he posed to the vocational expert.  AR 55 ("The individual should avoid working around excessive noise. Could an individual with these limitations perform any of the claimant's past work either as actually or generally performed?").  The end result of the ALJ's analysis—that Plaintiff is unable to perform any past relevant work, but is capable of working as a bagger, package sealer, or checker—also matches up with the response the vocational expert provided to the hypothetical including the environmental limitation.  AR 55-56.

The ALJ does appear to have inadvertently omitted the environmental limitation in his

14

express recitation of the RFC, despite all indications that the decision included consideration of the environmental limitation.  AR 14.  The Court is not convinced, however, that this apparent typographical error is harmful and requires remand.  As detailed above, the decision:  (1) anticipates an excessive noise limitation when initially discussing Plaintiff's hearing loss; (2) explains that it is giving weight to a recommendation for an excessive noise limitation; (3) assumes an excessive noise limitation in its past relevant work analysis; and (4) assumes an excessive noise limitation in explaining which jobs in the national economy Plaintiff could perform.  To pretend that no excessive noise limitation was assessed would render the decision nonsensical and elevate the technical form of the decision above its substance.  Because the ALJ considered the functional limitations imposed by Plaintiff's hearing loss despite finding the hearing loss non-severe, no harmful error occurred.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *McVay v. Colvin*, No. 14-cv-05008 JRC, 2014 WL 2563306, at *4 (W.D. Wash. July 18, 2014) (ALJ's typographical error harmless where "[i]t is clear what he meant"), *citing Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).

**C.  The ALJ's Treatment of Treating Physician Opinions**

*i.  Legal standards*

The weight given to medical opinions depends in part on whether they are offered by treating, examining, or non-examining (reviewing) professionals.  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may reject the *uncontradicted* opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. *Lester*, 81 F.3d at 830.  While a treating professional's opinion is generally accorded superior weight, if it is contradicted by an examining professional's opinion (when supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews*

1 | *v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995), *citing Magallanes v. Bowen*, 881 F.2d 747, 751

2 | (9th Cir.1989).  The regulations require the ALJ to weigh the contradicted treating physician

3 | opinion, *Edlund v. Massanari*, 253 F.3d 1152 (9th Cir. 2001), but the ALJ need not give it any

4 | weight if it is conclusory and supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d

5 | 1111, 1113 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion

6 | rejected); *see also Magallanes*, 881 F.2d at 751.

7 | The opinion of an examining physician is, in turn, entitled to greater weight than the

8 | opinion of a non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990);

9 | *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating

10 | physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

11 | uncontradicted opinion of an examining physician.  And like the opinion of a treating doctor, the

12 | opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for

13 | specific and legitimate reasons that are supported by substantial evidence in the record.  *Lester v.*

14 | *Chater*, 81 F.3d 821, 830 (9th Cir. 1996).

15 | The opinion of a non-examining physician may constitute substantial evidence when it is

16 | "consistent with independent clinical findings or other evidence in the record."  *Thomas v.*

17 | *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  Such independent reasons may include laboratory

18 | test results or contrary reports from examining physicians, and plaintiff's testimony when it

19 | conflicts with the treating physician's opinion.  *Lester*, 81 F.3d at 831, *citing Magallanes*, 881

20 | F.2d at 751–55.

21 | ### ii.   Analysis

22 | Plaintiff argues that the ALJ "inexplicably ignored [the] opinions and treatments of Ms.

23 | Jackson's VA physicians."  (Plaintiff's Opening Brief 9:10-12, ECF No. 15.)  It is unclear

24 | precisely which conclusion(s) or opinion(s) Plaintiff believes the ALJ rejected, although she cites

25 | findings by VA physicians that:  (1) Plaintiff's "arthritis was considered a 'disabling medical

26 | condition,'"; (2) Plaintiff had "hearing loss at a level that her treating physician opined 'impacts

27 | ordinary conditions of daily life, including [the] ability to work,"; and (3) Plaintiff's doctor

28 | "prescribed use of a cane."  *Id*. at 9:2-9.

1   Defendant responds that:  (1) the conclusions that Plaintiff points to occurred in 2010,

2   before the relevant time period for which Plaintiff is seeking benefits; (2) the ALJ considered the

3   findings that Plaintiff contends he rejected; (3) the findings that the ALJ allegedly rejected were

4   ultimate conclusions re: disability and were thus reserved to the discretion of the ALJ; and (4) the

5   objective medical evidence demonstrates that Plaintiff was not disabled.

6   As a threshold issue, Defendant is correct that at least one of the opinions that Plaintiff

7   cites dealt with issues that were reserved to the discretion of the Commissioner.  The regulations

8   governing the consideration of medical opinions carve out opinions on a subset of topics as

9   reserved to the Commissioner's discretion.  A statement offered by a physician that a plaintiff is

10  "disabled" or "unable to work," for example, is not entitled to "any special significance" because

11  it constitutes an "opinion on issues reserved to the Commissioner."  20 C.F.R. §§ 416.927(d)(1),

12  (3).  An ALJ must consider, however, opinions on other topics.  Medical opinions in the record,

13  for example, "that reflect judgment about the nature and severity of [plaintiff's] impairments,

14  including [plaintiff's] symptoms, diagnosis and prognosis, what [plaintiff] can still do despite

15  impairment(s), and [plaintiff's] physical or mental restrictions," must be considered.  20 C.F.R. §

16  416.927(a)(2), (b) ("In determining whether you are disabled, we will always consider the

17  medical opinions in your case record together with the rest of the relevant evidence we receive").

18  The conclusions that Plaintiff asserts the ALJ incorrectly rejected here are opinions that:

19  (1) Plaintiff was unable to work because of her arthritis; (2) Plaintiff's hearing loss impacted her

20  ability to work; and (3) Plaintiff required the use of a cane.  The first is indisputably an issue that

21  is reserved to the Commissioner—it constitutes an ultimate determination as to whether the

22  Plaintiff is disabled.  The ALJ was thus fully justified in disregarding that conclusion.[8]  The

23  second and third, however, are medical opinions that arguably discuss functional limitations that

24

25  [8] Notably, Plaintiff also misstates the opinion of Plaintiff's treating physician with respect to her arthritis.  Plaintiff
    claims that her physician found that her "arthritis was considered a 'disabling medical condition.'"  (Plaintiff's

26  Opening Brief 9:2-4, ECF No. 15.)  But the record states precisely the opposite.  On May 24, 2012, Dr. Lauber filled
    out two Disability Questionnaires for VA Disability Benefits.  AR 401-421.  Regarding Plaintiff's arthritis, Dr.

27  Lauber marked "No" in response to the question "Does the Veteran's foot condition impact his or her ability to
    work?"  AR 408.  Dr. Lauber responded similarly in response to a question regarding the arthritis in Plaintiff's knees
    and legs.  AR 420.  Thus, to the extent that the treating physician opinions on this topic were entitled to significance,

28  they did not require any additional functional limitations be incorporated into the RFC.

1    Plaintiff may have.

2        With respect to (2), Plaintiff argues that the ALJ rejected the opinion of Steven Mecham,

3    an audiologist who examined Plaintiff on May 10, 2012.  AR 433-442.  In particular, Mecham

4    noted that Plaintiff complained of "difficulties in understanding conversational speech in the

5    presence of background noise."  AR 440.  The ALJ did not reject this finding, however.  As

6    explained above, Dr. Wagner concurred with the audiologist's findings.  AR 1024.  The ALJ then

7    accorded Dr. Wagner's findings weight.  AR 21.  The ALJ then incorporated that finding into the

8    RFC as a limitation that Plaintiff avoid excessive noise.  It is thus entirely unclear why Plaintiff

9    would argue that the ALJ rejected Mecham's recommendation.

10       Finally, Plaintiff contends that her treating physicians concluded that she required a cane

11   to walk.  As an initial matter, it is not clear that Plaintiff's treating physicians actually concluded

12   that she required a cane to walk.  The only evidence that Plaintiff puts forward to suggest that her

13   physicians came to this conclusion is a requisition request filed by one of her doctors with the VA

14   asking that they provide her a cane—there is no record of a doctor recommending or prescribing a

15   cane.  AR 440.  The only other notes by her treating physicians regarding her cane simply note

16   that she has a cane.  AR 1221.  They do not say that she requires the cane to walk or that it should

17   be included in her functional limitations.

18       Even if Plaintiff's treating physicians concluded that she needed a cane to walk, this

19   conclusion was contradicted by the findings of Drs. Wagner, Clancey, and Kurtin, a fact that the

20   ALJ noted in his decision.  AR 21.  The ALJ would thus need specific and legitimate reasons

21   supported by substantial evidence to reject such a conclusion.  *Lester*, 81 F.3d at 830.  Dr.

22   Wagner's consulting examination and the report summarizing that examination constitutes such

23   evidence.  Dr. Wagner conducted a complete physical examination and concluded that, although

24   Plaintiff carried a "homemade walking stick" with her, such an assistive device was "[n]ot

25   necessary."[9]  AR 1025.  A report based on an independent physical examination can constitute

26   substantial evidence to reject a finding by a treating physician.  *Tonapetyan v. Halter*, 242 F.3d

27   1144, 1149 (9th Cir. 2001) (examining physician's opinion "alone constitutes substantial

28   _____

[9] It is unclear why Plaintiff was using a homemade walking stick instead of the cane she received from the VA.

evidence" to reject treating physician's opinion where it "rests on his own independent examination").

The treating opinion is also brief, conclusory, and inadequately supported by clinical evidence.  As noted above, little in the record supports the contention that Plaintiff needed a cane to walk.  The mere fact that a treating physician asked that a cane be provided for Plaintiff would not create an obligation on the part of the ALJ to accord that opinion weight.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) ("the ALJ need not accept a treating physician's opinion which is brief and conclusory in form with little in the way of clinical findings to support [its] conclusion").  To the extent the ALJ rejected the opinions of Plaintiff's treating physicians, the ALJ's decision was supported by substantial evidence.

### D.  The ALJ's Evaluation of Plaintiff's Credibility

#### i.  *Legal standards*

To evaluate the credibility of a claimant's testimony regarding subjective complaints of pain and other symptoms, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id*.  The claimant is not required to show that the impairment "could reasonably be expected to cause the *severity* of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (emphasis added).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of the symptoms for "specific, clear and convincing reasons" that are supported by substantial evidence.  *Id*.

An ALJ can consider a variety of factors in assessing a claimant's credibility, including:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks

1  omitted).

2     Other factors can include a claimant's work record and testimony from physicians and

3  third parties concerning the nature, severity, and effect of the symptoms of which the claimant

4  complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  An ALJ can only rely

5  on an inconsistency between a claimant's testimony and the objective medical evidence to reject

6  that testimony where the ALJ specifies which "complaints are contradicted by what clinical

7  observations." *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999).

8  An ALJ properly discounts credibility if she makes specific credibility findings that are properly

9  supported by the record and sufficiently specific to ensure a reviewing court that she did not

10  "arbitrarily discredit" the testimony.  *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).

11                    *ii.   Analysis*

12     The ALJ's decision questions Plaintiff's credibility with respect to the severity of her

13  symptoms.  AR 22 ("the claimant's statements concerning the intensity, persistence and limiting

14  effects of these symptoms are not entirely credible due to numerous inconsistencies").  The ALJ

15  is thus required to provide "specific, clear and convincing reasons" for finding Plaintiff not

16  credible.  *Vasquez*, 572 F.3d at 591.

17     The ALJ offers a lengthy discussion of his consideration of Plaintiff's testimony.

18  Ultimately, he offers two reasons for finding Plaintiff not credible:  (1) Plaintiff's allegations of

19  pain and her limitations are not supported by the evidence in the record (AR 15); and (2)

20  Plaintiff's testimony at the hearing is inconsistent with her statements submitted in her function

21  reports.  AR 16 ("Some of the claimant's statements contradict her testimony at the hearing").

22  The Court will consider each of these reasons in turn.

23     The fact that a Plaintiff's statements are not supported by the objective evidence in the

24  record may constitute a reason to find those statements unpersuasive, although it cannot represent

25  the **only** reason.  *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) ("an adjudicator may not

26  reject a claimant's subjective complaints based solely on the lack of objective medical evidence

27  to fully corroborate the alleged severity of pain").  When this rationale is relied on, the ALJ "must

28  be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the

claimant's testimony on permissible grounds." *Id.*  This means that the ALJ must "identify specifically which of [Plaintiff's] statements she found not credible and why."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (ALJ's statement that "the functional limitations from the claimant's impairments were less serious than she has alleged" insufficiently specific to justify rejection of testimony).

In his decision, the ALJ recounts each of the alleged conditions/impairments and describes whether they are supported by the objective medical evidence.  AR 15.  He also identifies the specific statements by Plaintiff which this evidence contradicts.  *See, e.g.*, AR 15 ("She alleges taking medication for migraines since 2011, but a 2013 report from the VA indicates she was never previously diagnosed or treated for headaches").  Indeed, in some cases the ALJ even asked Plaintiff to resolve the specific discrepancies in her hearing testimony with the evidence in the medical record.  AR 37 ("Q. All right. Tell me about these migraine headaches. A. They're severe. It gets to the point where sound, light, noise, anybody makes it worse. I go and isolate myself. I sit in a dark room. Q. And how long have you had them? A. Before about two, three years now, I've had them really bad. Q. There's a VA report from 2013 that states that you were never diagnosed or treated for headaches. How do you explain that discrepancy? A. I have—they prescribed medication for me for it. It's listed with my--").  The ALJ's reasoning here is sufficiently specific to cast doubt on the credibility of this statement. Because the presence of contrary objective evidence cannot form the sole rationale to reject a plaintiff's testimony, however, this reason alone is not dispositive.

The ALJ also found that Plaintiff's testimony was internally inconsistent.  AR 16 ("Some of the claimant's statements contradict her testimony at the hearing.").  A pattern of inconsistencies in a plaintiff's testimony can constitute a reason to find her not credible. *Tommasetti*, 533 F.3d at 1039 ("An ALJ may consider many factors in weighing a social security claimant's credibility, including . . . prior inconsistent statements").  The ALJ found that Plaintiff's testimony about her particular daily activities were contradicted by statements she made in her function reports.  Among other things, Plaintiff told the ALJ that she did not prepare her own meals.  AR 39 ("Q.  Do you prepare your own meals? A. No. My kids prepare them for

me. Q. Your children prepare them? A. Yeah, my son prepares them. Sometimes I prepare my own meal but it's not – I tend to forget to eat.")  In her function report, however, Plaintiff stated that she does prepare her own meals, including "meals such as spaggetti [sic], enchiladas . . . salad[s] fruits and vegetables."  AR 258.  Similarly, she told Dr. Wagner that she prepared her own meals.  AR 1024 ("She does make food for herself and does some cleaning . . . [s]he does perform her own activities of daily living without assistance.").

She also testified at the hearing that she could only walk 10 or 15 steps at a time.  AR 46 ("Q. Okay. And walk, how far can you walk before you'd have to stop the very first time? A. Maybe 10, 15 steps or something like that and then I'd have to stop to rest because of the pain.").  In her function report, however, she stated that she could walk up to half a block and walked at least 30 minutes a day.  AR 259, 261.  And when she spoke with Dr. Wagner, she reported that she could "walk easily a half mile and did so today" and that "she walks a lot to get around."  AR 1024.  She also described taking "long walks" to Dr. Swanson and apparently walked to the testing session by herself. AR 1033.  These are all inconsistencies for which Plaintiff offers no explanation.  Taken in conjunction with the above-mentioned conflicts between Plaintiff's testimony and the objective evidence, the ALJ provided specific, clear, and convincing reasons supported by substantial evidence to disbelieve Plaintiff's allegations of her symptoms.

**E.  Third Party Credibility**

*i.  Legal standards*

Lay witness testimony as to a claimant's symptoms is competent evidence, which the Commissioner must take into account.  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  The ALJ may reject such testimony if he does so expressly by providing "reasons that are germane to each witness."  *Dodrill* 12 F.3d at 919.  An ALJ need not reconsider each witness individually; "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012), *citing Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).  An ALJ can disregard a third party statement, for example, that "conflicts with medical evidence."  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  To reject lay

1   testimony, "the ALJ need not cite to the specific record as long as 'arguably germane reasons' for

2   dismissing the testimony are noted." *Caldwell v. Astrue*, 804 F.Supp.2d 1098, 1104 (D. Or.

3   2011).

4                                    *ii.   Analysis*

5       Plaintiff also challenges the ALJ's rejection of a third party statement by Amanda

6   Jackson, Plaintiff's daughter.  The ALJ provided an extensive discussion of Amanda Jackson's

7   statement, summarizing her third party statements and concluding that:

8           The declarant's statements are not only internally inconsistent, but also
            inconsistent with other record evidence, including medical evidence and medical
9           source opinions. In one report, she reported the claimant had never lost a job due
            to not getting along with others, in another report, she said the opposite. In one
10          report, she reported the claimant had no problem getting along with family,
            friends and neighbors. In another report, she said the opposite. She reported the
11          claimant did not brush her hair, and in the same report, said she brushed her hair
            routinely in the morning after arising. I accord the declarant's statements very
12          little weight because of these inconsistencies.

13  AR 17.

14      The third party statements were offered by Plaintiff for the same reason Plaintiff's

15  testimony was offered:  to describe the severity of Plaintiff's symptoms.  *Compare* AR 38 ("Q.

16  Okay. So what mental health problems do you have? A. Severe depression to the point where I

17  don't want to get up out of bed. I don't want to function, don't want to do anything. Suicidal

18  tendency thoughts.") *with* AR 228 ("She is depressed most of the time . . . She's either sleeping or

19  staring of[f] into space or agitated and moving").  Because the ALJ found that Plaintiff's

20  testimony was not credible on this issue, he was within his authority to reject third party

21  statements on the issue for the same reasons.  *Valentine*, 574 F.3d at 694 ("In light of our

22  conclusion that the ALJ provided clear and convincing reasons for rejecting Valentine's own

23  subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it

24  follows that the ALJ also gave germane reasons for rejecting her testimony.").

25      In addition, internal inconsistencies within a third party's statements constitute a germane

26  reason to reject that third party's statements.  *Woodsum v. Astrue*, 711 F.Supp.2d 1239, 1262

27  (W.D. Wash. 2010) ("inconsistencies between the lay witness statements and the other evidence

28  in the record—including plaintiff's own self-reports—regarding social functioning, and the

normal mental status examinations noted by the ALJ, do constitute germane reasons").  The

inconsistencies the ALJ identifies do, in fact, appear in the record.  *Compare* AR 234 (Jackson

marks "No" in response to question "Has he/she ever been fired or laid off from a job because of

problems getting along with other people?") *with* AR 312 (Jackson marks "Yes" in response to

the question "Has he or she ever been fired or laid off from a job because of problems getting

along with other people?").

Finally, the ALJ was justified in rejecting the third party statements because they

contradicted medical evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.

2005) ("An ALJ need only give germane reasons for discrediting the testimony of lay witnesses.

Inconsistency with medical evidence is one such reason.") (internal citations omitted).  The third

party statements here are plainly contradicted by the record.  For example, Jackson writes that

Plaintiff requires both a cane and a wheelchair "to get around," a finding that is contradicted by

Dr. Wagner's express finding that Plaintiff did not even need a cane to walk.  AR 312, 1025.  Her

statements regarding the debilitating effects of Plaintiff's depression were likewise inconsistent

with Dr. Swanson's mental health examination.  *Compare* AR 228 (Plaintiff is "either sleeping or

staring of[f] into space" for long periods of time) *with* AR 1034 ("No suicidal or homicidal

ideation was elicited. Vegetative signs of depression were mostly absent. Short-term, recent, and

remote memories were within normal limits . . . She maintained satisfactory attention and

concentration and the results are considered a valid representation of her current functioning").

Plaintiff argues that Jackson erroneously dated one of her two third party statements "June

29, 1983" (despite the fact that it was submitted in April 2013) and that this error introduces an

ambiguity in the record that should have triggered the ALJ's duty to develop the record.  An ALJ

has a duty to "fully and fairly develop the record and to assure that the claimant's interests are

considered."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  This duty is triggered

when there is "[a]mbiguous evidence" or on "the ALJ's own finding that the record is inadequate

to allow for proper evaluation of the evidence."  *Id.*  However, an ALJ "does not have to exhaust

every possible line of inquiry in an attempt to pursue every potential line of questioning."

*Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) ("The standard is one of reasonable

good judgment"). Indeed, an ALJ is only required to conduct further inquiries with a treating or consulting physician "if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 319-20 (8th Cir. 2010). The duty to develop the record is typically triggered where, for example, a claimant's medical records are incomplete or there is an "issue sought to be developed which, on its face, must be substantial." *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007).

The ALJ did not have a duty to develop the record based on Jackson's typographical error. There was ample medical evidence in the record to fully and completely assess the issue of disability—indeed, the administrative record in this case is comprised of over 1300 pages and thoroughly traces Plaintiff's medical history back over a ten year period. And, as explained above, there were adequate reasons to discredit Jackson's statements even without considering the error. The ALJ did not err in neglecting to develop this issue. Moreover, he provided multiple germane reasons to find Amanda Jackson's statements not credible and committed no error in rejecting them.

## VI.   CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record and based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Commissioner of Social Security and against Plaintiff Delphine Scott Jackson.

IT IS SO ORDERED.

Dated:   **February 26, 2016**       /s/ *Erica P. Grosjean*
UNITED STATES MAGISTRATE JUDGE

25